IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0247-05






RAY GONZALEZ, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FOURTH COURT OF APPEALS


BEXAR COUNTY





 Cochran, J., delivered the opinion of the Court, in which Keller, P.J.,
Meyers, Price, Womack, Keasler, Hervey, and Holcomb, JJ., joined. Johnson, J.,
filed a concurring opinion.


O P I N I O N 



 The question presented in this case of first impression is whether appellant forfeited,
by his own misconduct of fatally shooting Maria Herrera during a robbery or the burglary of
her home, his right to confront Maria in court about hearsay statements she made before she
died. (1) We find that he did, and we therefore affirm the judgment of the court of appeals
which held the same. (2)

I.

 San Antonio police officers, responding to 911 calls, arrived at Maria and Baldomero
Herrera's home shortly after 6:00 p.m. on May 3, 2002, and found that both of them had been
shot. Maria lay near the front door. She was in shock, scared and bleeding, but she was still
conscious and asking for help. Baldomero was sprawled unconscious in an easy chair. 
When officers asked her what had happened, Maria excitedly said that she and her husband
had been shot by "a Latin male, blondish colored hair, and he was about 18 years old." She
said "the person that did it is related to the people that live across the street in the rock
house." Maria kept repeating that he had colored or bleached hair. She stated "that the guy
that shot her took her truck" and "she had recognized him from-from the house across the
street that had a rock wall in front of it." Maria said it was "just one person." Baldomero
died at their home; Maria died at the hospital a few hours later.

 Officers found the license plate number of the Herreras' new white Nissan truck and
broadcast it over the police radio. There was only one house with a rock face across the
street; appellant's grandmother lived there. Appellant's aunt had left him there earlier in the
day. His hair was spiky and blonde on top.

 Around 6:00 p.m., appellant arrived at his cousin's apartment in the Herreras' truck. 
According to Sylvia Flores, appellant's cousin, he arrived alone. When Sylvia asked him
where he got the truck, appellant said that he got it from selling drugs. Sometime later,
appellant's brother and his brother's wife arrived in their Ford truck. 

 While appellant was at Sylvia's apartment, a police officer on routine patrol, who had
heard the broadcast about the Herreras' stolen truck, saw it parked at Sylvia's apartment
complex. He radioed for assistance, and undercover officers in unmarked cars soon arrived
and set up surveillance. Around 7:45 p.m., undercover officers noticed a "bleach blonde
Latin," later identified as appellant, and another male walk out to the truck, then they both
went back inside. At 9:20 p.m., three people, including appellant, came out of the apartment.

 Appellant got into the Herreras' Nissan; the other two people got into the Ford truck. 
The Nissan then followed the Ford out of the apartment complex. When the SWAT officers
followed behind him, appellant raced off in the stolen truck, leading officers on a sometimes
high-speed chase that lasted about 15 minutes. Eventually, appellant drove down a one-way
street and was blocked in by police cars. Appellant refused to get out of the truck, so he was
pulled out, handcuffed, and searched. Officers found a black address book, containing
Baldomero's credit cards, in his pocket. Appellant was taken to jail and his clothes, a white
shirt, jeans and tennis shoes, were collected. Maria's blood was found on the tennis shoes. 
 The medical examiner testified that Baldomero died from a single gunshot wound to
the chest; Maria, who had been shot from three to five times, died from a gunshot wound to
the abdomen. 

 Appellant was charged with capital murder. In a motion in limine, and again at trial,
appellant objected to the admission of Maria's statements to the police officers as hearsay
and as violating his confrontation rights. The trial court held a hearing outside the presence
of the jury to determine if Maria's statements to three different officers were admissible. The
State argued that Maria's statements, though hearsay, were admissible under the excited
utterance and dying declaration exceptions. Appellant argued that the statements were not
dying declarations; he pointed to the officers' testimony that Maria was not aware of the
gravity of her condition. He also argued that her statements were not excited utterances
because they were not spontaneous; instead, they were answers to police questions. The trial
judge doubted that the statements were dying declarations, but he admitted them "mainly
under the excited utterance" exception, noting that they also fell under the hearsay exceptions
for present-sense impression and then-existing physical condition. The jury convicted
appellant of capital murder and sentenced him to life imprisonment.

 One of appellant's claims on appeal was that the admission of Maria's out-of-court
"testimonial" statements violated his right to confrontation under Crawford v. Washington, (3)
which the Supreme Court had delivered during the pendency of his appeal. The court of
appeals held that Maria's statements were excited utterances and decided that it need not
resolve whether they were also testimonial because appellant had forfeited his right to
confrontation under the doctrine of forfeiture by wrongdoing. (4) Noting that the Supreme
Court had stated in Crawford that it would continue to recognize the doctrine of forfeiture
by wrongdoing, which "extinguishes confrontation claims on essentially equitable grounds,"
the court of appeals held that "Gonzalez is precluded from objecting to the introduction of
Maria's statements on Confrontation Clause grounds because it was his own criminal
conduct (in this case, murder) that rendered Maria unavailable for cross-examination." (5) 

II.

 In all criminal prosecutions, the accused has a Sixth Amendment right to be
confronted with the witnesses against him. Even when hearsay offered against a defendant
is admissible under evidentiary rules, that evidence may implicate the Confrontation Clause
of the Sixth Amendment if the defendant is not afforded the opportunity to confront the
out-of-court declarant. (6) In Crawford v. Washington, the Supreme Court held that "where
testimonial statements are at issue, the only indicium of reliability sufficient to satisfy
constitutional demands is the one the Constitution actually prescribes: Confrontation." (7) 
Nevertheless, the Supreme Court recognized that equitable exceptions to the Confrontation
Clause may still apply, and it specifically mentioned the doctrine of forfeiture by wrongdoing
which "extinguishes confrontation claims on essentially equitable grounds" as one that it
accepts. (8) 

 The doctrine of forfeiture by wrongdoing has been a part of the common law since at
least 1666. (9) In early English cases, the doctrine allowed a witness's deposition testimony to
be admitted instead of live testimony if the defendant caused the witness's absence from
trial. (10) The doctrine is based on the principle that "any tampering with a witness should once
for all estop the tamperer from making any objection based on the results of his own
chicanery." (11) In other words, the rule is based on "common honesty" and the maxim that
"no one shall be permitted to take advantage of his own wrong." (12)

 The Supreme Court first applied the doctrine of forfeiture by wrongdoing over a
century ago in Reynolds v. United States. (13) Reynolds was on trial for bigamy. The
prosecution offered the prior testimony of Reynolds's second wife when it was unable to
subpoena her because Reynolds refused to reveal her location. (14) Reynolds claimed that the
admission of her former testimony violated his Sixth Amendment rights, but the Supreme
Court held that Reynolds's wrongful act of hiding his wife away from trial trumped his right
of confrontation:

 The Constitution gives the accused the right to a trial at which he should be
confronted with the witnesses against him; but if a witness is absent by his
own wrongful procurement, he cannot complain if competent evidence is
admitted to supply the place of that which he has kept away. The Constitution
does not guarantee an accused person against the legitimate consequences of
his own wrongful acts. It grants him the privilege of being confronted with the
witnesses against him; but if he voluntarily keeps the witnesses away, he
cannot insist on his privilege. If, therefore, when absent by his procurement,
their evidence is supplied in some lawful way, he is in no condition to assert
that his constitutional rights have been violated. (15)


Several early Texas cases referenced or followed the rule in Reynolds. (16)

 Because of witness tampering in organized-crime prosecutions during the 1970's,
several federal courts of appeals either followed Reynolds or expanded the forfeiture
doctrine. (17) The doctrine was applied when a defendant intimidated, bribed, or killed a
witness to keep him from testifying about a prior crime, and it was used to admit more than
just former testimony or depositions; it also allowed the admission of statements made to
police by cooperating witnesses who were killed before trial. The rule "operated as a
disincentive to keep organized crime affiliates from 'knocking off' witnesses." (18) 

 In 1997, the "forfeiture by wrongdoing" doctrine was codified in the Federal Rules
of Evidence as a hearsay exception. (19) By that time every circuit that had addressed the issue
had recognized the doctrine of forfeiture by misconduct. (20) The doctrine was added to Rule
804 to clarify that a party forfeits the right to object, on hearsay grounds, to the admission
of a declarant's prior statement when that party's deliberate wrongdoing procured the
unavailability of the declarant as a witness. (21) As the advisory committee note explained:

 The most obvious situation for employing this exception is where a criminal
defendant kills a witness, or has him killed, to prevent him from testifying; by
engaging in this conduct, the defendant has forfeited the right to object on
hearsay grounds to any of the victim's statements. The Rule was derived from
cases that have held that a criminal defendant forfeits his right to confrontation
if he causes or acquiesces in the witness' unavailability. If the defendant's
conduct is such as to cause a forfeiture of the constitutional objection, it should
a fortiori be enough to cause a forfeiture of the parallel hearsay objection. (22)

 Before the Rule 804(b)(6) hearsay exception can apply, the offering party must show
that the opposing party committed the wrongdoing with the intent to prevent the declarant's
testimony:

 Under the Rule, it must be shown that the party against whom the evidence is
offered acted with intent to procure the unavailability of the declarant as a
witness. If the defendant kills a declarant simply because he didn't like him,
or because he was burned in a drug deal by him, then the defendant has not
forfeited his right to object to the declarant's hearsay statement. It follows that
the defendant in a murder case cannot be held to have forfeited his objection
to hearsay statements made by the victim. The defendant might have murdered
the victim, but he undoubtedly didn't murder the victim to prevent him from
testifying in the murder trial. (23)

Some version of the forfeiture doctrine has been adopted in various state courts. (24) While
courts have widely accepted the doctrine of forfeiture by wrongdoing to reject both hearsay
objections and confrontation claims, the test for determining whether there is a forfeiture has
varied. Courts have agreed that forfeiture requires (1) the declarant's unavailability, (2) as
a result of the defendant's act of misconduct. Courts have disagreed on whether the
defendant must intend that his act of misconduct silence the witness. (25) Courts also have
disagreed on whether evidence inadmissible under Federal Rule 804(b)(6) (i.e. when the
predicate wrongdoing is the same crime for which the defendant is being tried) might
nonetheless be admissible over a confrontation clause objection under the forfeiture
doctrine. (26)

 This debate has taken on new life since the Crawford decision. (27) Several courts have
used the language in Crawford to apply the forfeiture doctrine expansively-when the 
wrongdoing is the same crime for which the defendant is being tried and without regard to
whether the defendant intended to silence the witness. (28) Other courts have held that the
forfeiture doctrine does not apply in those situations because (1) the defendant's wrongdoing
only indirectly "procured" the witness's absence; (2) the wrongful act was not done with the
intent to prevent the witness from testifying; or (3) it is the same wrongful act for which the
defendant is on trial. (29)

 In United States v. Mayhew, (30) the district court cited to the amicus brief filed by a
group of law school professors in Crawford to apply the forfeiture doctrine even though the
defendant was on trial for the very act of murder that caused the declarant's unavailability. (31) 
In their brief, the professors did not mention the role of the wrongdoer's intent. They simply
stated,

 If the trial court determines as a threshold matter that the reason the victim
cannot testify at trial is that the accused murdered her, then the accused should
be deemed to have forfeited the confrontation right, even though the act with
which the accused is charged is the same as the one by which he allegedly
rendered the witness unavailable. (32) 

 Mayhew also relied on United States v. Garcia-Meza, (33) a case in which the Sixth
Circuit held that the government need not show that "the defendant purposefully procured
a witness's absence" before the forfeiture doctrine applies. In that case, the defendant was
on trial for stabbing his wife to death. At trial, the government offered statements that she
had made to the police after an earlier beating but before the fatal stabbing. The defendant
objected, arguing that admission of these statements violated his Confrontation rights
because he had not had an opportunity to cross-examine her. He further argued that the
forfeiture doctrine was not applicable because he had not killed his wife with the intent to
prevent her from testifying. The Sixth Circuit held that the motive behind the defendant's
wrongdoing was irrelevant. It explained that the equitable basis of the forfeiture doctrine,
as set out in Crawford, prevented the defendant from benefitting in any way from his
wrongdoing:

 The Defendant . . . argues that for the rule of forfeiture to apply, a defendant
must have killed or otherwise prevented the witness from testifying with the
specific intent to prevent her from testifying. Since he did not kill her with the
specific intent to prevent her from testifying, the Defendant argues, he should
not be found to have forfeited his right to confront her. There is no
requirement that a defendant who prevents a witness from testifying against
him through his own wrongdoing only forfeits his right to confront the witness
where, in procuring the witness's unavailability, he intended to prevent the
witness from testifying. Though the Federal Rules of Evidence may contain
such a requirement, see Fed. R. Evid. 804(b)(6), the right secured by the Sixth
Amendment does not depend on, in the recent words of the Supreme Court,
"the vagaries of the Rules of Evidence." Crawford, 124 S. Ct. at 1370. The
Supreme Court's recent affirmation of the "essentially equitable grounds" for
the rule of forfeiture strongly suggests that the rule's applicability does not
hinge on the wrongdoer's motive. The Defendant, regardless of whether he
intended to prevent the witness from testifying against him or not, would
benefit through his own wrongdoing if such a witness's statements could not
be used against him, which the rule of forfeiture, based on principles of equity,
does not permit. (34) 

 In the present case, the San Antonio Court of Appeals cited state-court decisions that
have held the same, including the Kansas Supreme Court in State v. Meeks (35) as well as
Colorado and California appellate courts in State v. Moore, (36) and People v. Giles. (37) Some 
post-Crawford decisions have declined to apply the forfeiture doctrine when the defendant's
actions did not directly cause the witness's absence or were not intended to make his
testimony unavailable. (38) For example, in People v. Melchor, (39) the evidence showed that the
defendant had intentionally absconded and engaged in an elaborate scheme to avoid the law
for ten years, during which time the sole eyewitness to the shooting, Ortiz, died from a drug
overdose. The forfeiture doctrine did not apply because there was no causal link between the
defendant's misconduct and the witness's unavailability. (40)

 In sum, the majority of post-Crawford cases have applied the forfeiture by
wrongdoing doctrine when the trial court makes a preliminary finding under Rule 104(a) (41)
that the defendant's act of misconduct caused the witness's unavailability, although some
have also required that the defendant acted with the intent to prevent the witness's testimony.

III.

 The determination of whether the forfeiture doctrine applies in the present case
appears, at first glance, to depend upon an interpretation of the scope of the "forfeiture by
wrongdoing"doctrine. We have been favored with thorough briefing by both the State and
appellant. The State cites to the language in Crawford and in the law professors' amicus
brief, and argues that the court of appeals correctly applied the forfeiture doctrine because
forfeiture by wrongdoing, as an equitable doctrine, does not require the prosecution to
establish the defendant's motive. Appellant, on the other hand, asserts that the doctrine
cannot apply unless the State shows that the defendant engaged in the wrongdoing for the
purpose of preventing the witness from testifying at a future trial. Appellant notes that pre-Crawford, the doctrine was generally applied only in the context of witness tampering, and
that the Supreme Courts in Pennsylvania, Alaska, and New York had expressly held that the
doctrine does not apply where the defendant murders the declarant for personal reasons rather
than to prevent the declarant from testifying. (42) Appellant faults post-Crawford cases
applying the doctrine as the court of appeals did in this case for fastening on language in
Crawford and Reynolds, without sufficient analysis of the history and intent of the rule. (43) 

 As both parties noted in oral argument, cases expanding the doctrine have sprouted
up after Crawford, even though Crawford itself did not elaborate on the parameters of the
doctrine it "accepted." The State argues that "[i]f it is true that forfeiture should only apply
when the accused specifically intends that the witness be made unavailable when he engages
in the wrongful conduct, the [Supreme] Court could have easily said so. Certainly the Court
was aware of authority for this proposition but chose not to mention forfeiture with this
limiting language." (44)

 We need not settle that dispute in this case. An examination of the entire record
clearly supports the inference that appellant shot the Herreras to silence them. They knew
him. They lived across the street from his grandmother and were friends with her and other
members of her family. Appellant entered the Herreras' home without a disguise and with
a very distinguishing characteristic-his dark hair dyed blonde. Indeed, there was no sign of
forced entry, so he was either welcomed or walked through an unlocked door. Appellant
entered the Herreras' home armed. And he shot to kill. Baldomero, who had not even gotten
up from his easy chair, was shot through the heart. Maria was also shot in the chest-and
when she did not die appellant shot her again and again. Both were shot from beyond two
feet. Both were left for dead.

 A logical inference is that appellant killed the Herreras because he wanted to steal
their truck and their money, and he didn't want any witnesses to his crime-especially
witnesses that knew him, and knew where to find him. (45) This case is factually different from
the post-Crawford cases that the court of appeals relied on. Those cases involved passion
or revenge killings-killings for personal reasons. (46) There was no evidence in this case that
appellant had any personal grudge against the Herreras; the evidence strongly supports the
inference that appellant committed burglary or robbery for financial gain and then murdered
the two witnesses who could identify him.

 We agree with those post-Crawford cases and the Crawford amicus brief that the
doctrine of forfeiture by wrongdoing may apply even though the act with which the accused
is charged is the same as the one by which he allegedly rendered the witness unavailable. 
The trial court in this case did not make a preliminary ruling on whether appellant killed
Maria, at least in part, to prevent her from testifying against him because this case was tried
before Crawford was decided. (47) Nonetheless, an evidentiary ruling, such as the one
admitting Maria's out-of-court statements, will be upheld on appeal if it is correct on any
theory of law that finds support in the record. (48)
 We agree with the court of appeals that the
record provides ample support for the admission of Maria's out-of-court statements, despite
appellant's Confrontation Clause objection, because appellant forfeited his right to confront
Maria by his own wrongful act. The evidence strongly suggests that the procurement of 
Maria's absence was motivated, at least in part, by appellant's desire to permanently silence
her and prevent her from identifying him. We express no opinion on the court of appeals's
broader holding that the procurement of a witness's absence need not be motivated by a
desire to silence the declarant for the forfeiture by wrongdoing doctrine to apply. 

 We affirm the judgment of the court of appeals.

Delivered: June 21, 2006

Publish
1. Appellant's sole issue is

 Whether the Court of Appeals erred in holding that the Petitioner forfeited his
right of confrontation under the doctrine of "forfeiture by wrongdoing."
2. Gonzalez v. State, 155 S.W.3d 603 (Tex. App.-San Antonio 2004). 
3. 541 U.S. 36 (2004).
4. Gonzalez, 155 S.W.3d at 610. In a footnote, the court expressed doubt that the
statements Maria made to the investigating officers could be classified as "testimonial" because
"[a]n unstructured interaction between an officer and witness shortly after a distressing event has
occurred, like that which occurred here, simply does not fit within a lay conception of
'interrogation.'" Id. at n. 4 (citations omitted).
5. Id.
6. Shuffield v. State, 189 S.W.3d 782, , No. AP-74,574, 2006 Tex. Crim. App. LEXIS
365, *19 (Tex. Crim. App. February 15, 2006).
7. Crawford, 541 U.S. at 68.
8. Id. at 62; see Reynolds v. United States, 98 U.S. 145, 158-59 (1879).
9. In Reynolds, the Supreme Court stated that

 as long ago as the year 1666, it was resolved in the House of Lords "that in case
oath should be made that any witness, who had been examined by the coroner and
was then absent, was detained by the means or procurement of the prisoner, and
the opinion of the judges asked whether such examination might be read, we
should answer, that if their lordships were satisfied by the evidence they had heard
that the witness was detained by means or procurement of the prisoner, then the
examination might be read; but whether he was detained by means or procurement
of the prisoner was matter of fact, of which we were not the judges, but their
lordships."

98 U.S. at 158.
10. Lord Morley's Case, 6 State Trials 769 (1666); Harrison's Case, 12 State Trials 851
(1692) (depositions taken before coroner admissible when trial judge rules that defendant had
attempted to bribe or "spirit away" two witnesses). As appellant points out, however, "[t]hese
early cases applying the 'rule of forfeiture by wrongdoing' dealt only with the admission of a
prior deposition or prior trial testimony, and involved post-crime attempts by the defendant, or
those acting on his behalf, to prevent the testimony of the witness at a pending criminal trial." 
Appellant's Brief at 10.
11. 5 John H. Wigmore, Evidence § 1406 at 219 (Chadbourn rev. 1974).
12. Reynolds, 98 U.S. at 159.
13. 98 U.S. 145 (1879).
14. A deputy sheriff testified that he had repeatedly attempted to subpoena the second wife
at her marital home, but that the defendant had repeatedly told him that she was not at home, he
refused to tell the deputy where she was, and informed him that she was not going to appear at
trial. 98 U.S. at 159-60. The inference that both the trial court and the Supreme Court drew was
that he had spirited her away so that she could not testify against him. Id.
15. Id. at 158. As pointed out by appellant, the "'competent evidence' to which the Court
referred was prior testimony of a witness whom the defendant had a full opportunity to confront
at an earlier trial." Appellant's Brief at 12.
16. Reynolds was mentioned in a dissenting opinion in Hobbs v. State, 53 Tex. Crim. 71,
112 S.W. 308 (1908) (on rehearing). In that case Presiding Judge Davidson disagreed with the
majority's conclusion that the inquest testimony of the absent witnesses was admissible even
though there was no evidence that the witnesses were absent because of the "suggestion,
procurement or act of the accused." 53 Tex.Crim. at 90, 112 S.W. at 319. Judge Davidson
quoted from Motes v. United States, 178 U.S. 458 (1900). In Motes, the Supreme Court found a
Confrontation Clause violation because "there was not the slightest ground in the evidence to
suppose that [the witness] had absented himself from the trial at the instance, by the procurement
or with the assent of either of the accused." Motes, 178 U.S. at 473-74.

 The rule in Reynolds was applied in Colbert v. State, 119 Tex. Crim. 394, 397, 43 S.W.2d
1099, 1100 (1931) (op. on reh'g). Colbert was convicted of murder; his conviction was reversed,
and he was tried again. At the second trial, the trial judge admitted the former testimony of a
witness who had, in the meantime, absconded to New Mexico. "A subpoena issued to El Paso
County, Texas, and the witness was located in New Mexico and was to go to El Paso to be
subpoenaed. Money was forwarded to the witness, who refused to go to El Paso and answered
by Western Union that he had been robbed and did not have the money." 119 Tex. Crim. at 395,
43 S.W.2d at 1100. Because this Court cited Reynolds, the defendant presumably had something
to do with the witness's refusal to go to El Paso. See also Smith v. State, 66 Tex. Crim. 593, 598,
148 S.W. 722, 724 (1912) (citing Reynolds).
17. See, e.g., United States v. Carlson, 547 F.2d 1346, 1359 (8th Cir. 1976); United States
v. Balano, 618 F.2d 624, 629 (10th Cir. 1979); United States v. Thevis, 665 F.2d 616, 630 (5th
Cir. 1982); United States v. Mastrangelo, 693 F.2d 269, 272 (2d Cir. 1982); Steele v. Taylor, 684
F.2d 1193, 1201-03 (6th Cir. 1982); United States v. Aguiar, 975 F.2d 45, 47 (2d Cir. 1992);
United States v. Houlihan, 92 F. 3d 1271, 1279 (1st Cir. 1996); United States v. White, 116 F.3d
903, 911-12 (D.C. Cir. 1997); United States v. Johnson, 219 F.3d 349, 355 (4th Cir. 2000);
United States v. Scott, 284 F.3d 758, 762-64 (7th Cir. 2002). See also John R. Kroger, The
Confrontation Waiver Rule, 76 B.U.L. Rev. 835, 835-89 (1996) (discussing United States v.
Houlihan and describing the "Charlestown Code of Silence" which, for years, protected the
violent Charlestown drug ring).
18. Joshua Deahl, Expanding Forfeiture Without Sacrificing Confrontation After Crawford,
104 Mich. L. Rev. 599, 601 (2005).
19. Fed. R. Evid. 804(b)(6) ("The following are not excluded by the hearsay rule if the
declarant is unavailable as a witness . . . . A statement offered against a party that has engaged or
acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the
declarant as a witness.").
20. Fed. R. Evid. 804, Notes of Advisory Committee on 1997 amendments ("Every circuit
that has resolved the question has recognized the principle of forfeiture by misconduct, although
the tests for determining whether there is a forfeiture have varied") (citing United States v.
Aguiar, 975 F.2d 45, 47 (2d Cir. 1992); United States v. Potamitis, 739 F.2d 784, 789 (2d Cir.
1984); Steele v. Taylor, 684 F.2d 1193, 1199 (6th Cir. 1982); United States v. Balano, 618 F.2d
624, 629 (10th Cir. 1979); United States v. Carlson, 547 F.2d 1346, 1358-59 (8th Cir.
1977);United States v. Thevis, 665 F.2d 616, 631 (5th Cir. 1982)).
21. Fed. R. Evid. 804, Notes of Advisory Committee on 1997 amendments.
22. Fed. R. Evid. 804, Commentary Stephen A. Saltzburg, Daniel J. Capra, and Michael
M. Martin.
23. Id.
24. See, e.g., State v. Gettings, 769 P.2d 25, 28 (Kan. 1989); State v. Valencia, 924 P.2d
497, 502 (Ariz. Ct. App. 1996); State v. Hallum, 606 N.W.2d 351, 354-56 (Iowa 2000); State v.
Magouirk, 539 So. 2d 50, 64-65 (La. Ct. App. 1988); State v. Black, 291 N.W.2d 208, 214
(Minn. 1980); State v. Sheppard, 484 A.2d 1330, 1345-47 (N.J. Super. Ct. Law Div. 1984);
Holtzman v. Hellenbrand, 92 A.D.2d 405, 412-14 (N.Y. App. Div. 1983).
25. See John R. Kroger, The Confrontation Waiver Rule, 76 B.U.L. Rev. 835, 854, 875-77
(1996) (noting that the majority rule required a showing of 1) declarant unavailability and 2)
procurement of the declarant's unavailability by the defendant; minority rule required, in
addition, 3) proof that the defendant causes a witness to be unavailable for trial for the purposes
of preventing that witness from testifying). Professor Kroger argued that the majority rule was
insufficient to protect a defendant's rights: 

 The majority test, with its two sole elements of unavailability and cause, is clearly
insufficient [because] it requires no analysis of the defendant's state of mind to
ensure that the waiver was intentional. The majority test simply turns the clock
back to 1878, imputing a waiver to the defendant on the basis of his conduct,
regardless of intent or purpose. . . . The three-part test applied by the First and
Fifth Circuits is a major improvement over the majority test. The purpose or
intent element of the test forces a court to analyze the defendant's state of mind to
ensure that the defendant truly intended to forgo confrontation of the witness at
trial.

Id. (footnotes omitted).
26. See United States v. Emery, 186 F.3d 921, 926 (8th Cir. 1999) (applying doctrine of
forfeiture by wrongdoing to statements of a federal informant after finding, by a preponderance
of the evidence, that the defendant was responsible for the informant's murder). In Emery, the
court rejected the defendant's contention that the doctrine applies only in a trial on the underlying
crimes about which the declarant would have testified, not in a trial for murdering the declarant: 

 We believe that both the plain meaning of Fed. R. Evid. 804(b)(6) and the
manifest object of the [forfeiture] principles just outlined mandate a different
result. The rule contains no limitation on the subject matter of the statements that
it exempts from the prohibition on hearsay evidence. Instead, it establishes the
general proposition that a defendant may not benefit from his or her wrongful
prevention of future testimony from a witness or potential witness. Accepting Mr.
Emery's position would allow him to do just that.

Id. Compare United States v. Lentz, 282 F. Supp. 2d 399 (E.D. Va. 2002), in which the district
court declined to apply the forfeiture rule to some out-of-court statements made by Ms. Lentz, the
victim: 

 Essentially, the Government asks the Court to find Defendant guilty of killing Ms.
Lentz by a preponderance of the evidence in order to allow the evidence to be
admitted to prove Defendant killed Ms. Lentz beyond a reasonable doubt. No
case cited by the Government stands for this proposition. In this case for which
Defendant is being tried under well settled Constitutional principles, Defendant is
presumed to be innocent until proven guilty. To hold otherwise would be to
deprive a defendant of his right to a jury trial and allow for a judge to
preliminarily convict a defendant of the crime on which he was charged. This
Court is unwilling to extend the reasoning in Rule 804(b)(6) to allow in the
testimony of a decedent victim for whose death a defendant is on trial.

Id. at 426.
27. On June 19, 2006, the Supreme Court reiterated the vitality of the doctrine of forfeiture
by wrongdoing as an exception to the right of confrontation in Davis v. Washington, Nos. 05-5224 & 05-5705, 2006 U.S. LEXIS 4886 (June 19, 2006) (reiterating Crawford statement that
doctrine of forfeiture by wrongdoing extinguishes confrontation claims on equitable grounds and
noting that "when defendants seek to undermine the judicial process by procuring or coercing
silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce.
While defendants have no duty to assist the State in proving their guilt, they do have the duty to
refrain from acting in ways that destroy the integrity of the criminal-trial system.").
28. See generally, Joshua Deahl, Expanding Forfeiture Without Sacrificing Confrontation
After Crawford, 104 Mich. L. Rev. 599 (2005); Jerome C. Latimer, Confrontation After
Crawford: The Decision's Impact on How Hearsay Is Analyzed Under the Confrontation Clause,
36 Seton Hall L. Rev. 327 (2006).
29. See note 28.
30. 380 F. Supp. 2d 961 (S.D. Ohio 2005). In Mayhew, the evidence showed that the
defendant shot and killed his ex-girlfriend and her fiancé, then kidnaped his daughter, Kristina.
He drove Kristina to West Virginia where, two days later, he was stopped by a West Virginia
state trooper for a traffic offense. When the officer approached the car, Mayhew drew a gun and
shot him. After a chase that ended at a roadblock, the defendant, still in his car, shot Kristina
twice, then shot himself in the chest. Kristina was taken to the nearest hospital, but died shortly
thereafter. She gave the police a recorded statement before she died, and the trial court admitted
it over the defendant's Confrontation Clause objection. Id. at 963.
31. Id. at 967-68.
32. See Crawford v. Washington, Brief Amicus Curiae of Law Professors Sherman J.
Clark, James J. Duane, Richard D. Friedman, Norman Garland, Gary M. Maveal, Bridget
McCormack, David A. Moran, Christopher B. Mueller, and Roger C. Park, in Support of
Petitioner, No. 02-9410, 2002 U.S. Briefs 9410 (July 24, 2003). The professors discussed
forfeiture in the following passages: 

 Like the right to counsel and the right to a jury trial, the right to confront
witnesses is subject to waiver, and it is also subject to forfeiture, for the accused
has no ground to complain if his own wrongdoing caused his inability to confront
the witness. Like those other rights, the right to confront adverse witnesses can
and should be applied unequivocally. That is, if the statement is a testimonial one
and the right has not been waived or forfeited, then the right should apply without
exceptions. This simple approach is possible because the scope of the right,
properly conceived, is quite narrow. It does not reach out-of-court statements in
general, but only those that are testimonial in nature.

 . . .

 If the accused will not have had an adequate opportunity to confront the witness,
then introduction of the testimonial statement to prove the truth of what it asserts
violates the accused's confrontation right unless the answer to the third question is
in the affirmative: Did the accused waive the right to confrontation by failing to
object, or forfeit it by misconduct? The accused might forfeit the right, for
example, by intimidating the witness, kidnaping her, or murdering her. An
accused cannot complain about his inability to confront the witness if it is his own
wrongful conduct that created that inability. This principle-rather than the fiction
that cross-examination would be practically useless anyway because a declarant
would not [want] to die with a lie on her lips-best explains the admissibility of
certain statements by dying witnesses.

 . . .

 If the trial court determines as a threshold matter that the reason the victim cannot
testify at trial is that the accused murdered her, then the accused should be deemed
to have forfeited the confrontation right, even though the act with which the
accused is charged is the same as the one by which he allegedly rendered the
witness unavailable. Just as in Bourjaily, bootstrapping does not pose a genuine
problem. See Richard D. Friedman, Confrontation and the Definition of Chutzpa,
31 Israel L. Rev. 506 (1997).


Id. at *3, 24 & n.16.
33. 403 F.3d 364, 370-71 (6th Cir. 2005).
34. Garcia-Meza, 403 F.3d at 370-71. See also United States v. Johnson, 354 F. Supp. 2d
939, 964 (N.D. Iowa 2005) ("the Emery decision defeats Johnson's contention that the exception
cannot apply unless the 'wrongdoing' upon which the exception is based is different from the
'wrongdoing' charged in the case, or there would be a 'murder victim's' exception."); People v.
Bauder, 269 Mich. App. 174, 184-85 (Mich. App. 2005) (adopting Garcia-Meza rationale and
applying forfeiture rule to domestic-violence victim's out-of-court statements when defendant
was on trial for murdering her).
35. 88 P. 3d 789 (Kan. 2004). Meeks involved a slight, which led to an argument, which 
led to a fight, which led to a death. At Meeks's murder trial, an officer testified that, when he
arrived at the scene, he asked the victim, James Green, who shot him. Green said, "Meeks shot
me." The defendant argued that the admission of the victim's statement violated his right to
confront Green. The court held that, by killing Green, Meeks forfeited his right to confront him. 
The court had previously applied the forfeiture doctrine in Gettings v. State, 769 P.2d 25 (Kan.
1989), a classic silencing-the-witness case. The court was not troubled by the seeming expansion
of the doctrine in light of the law professors' amicus brief: "Although Gettings involved
somewhat different facts from those of the instant case, in an amicus brief filed in Crawford by
law professors . . . in support of petitioner, the professors addressed our specific situation." Id. at
794.
36. State v. Moore, 117 P. 3d 1 (Colo. App. 2004). In Moore, the court held that when the
300-pound defendant sat on his wife, killing her, he forfeited his right to confront her about
statements implicating him in a prior instance of domestic violence. The court relied on Meeks
and stated that "a defendant is not to benefit from his or her wrongful prevention of future
testimony from a witness, regardless whether that witness is the victim in the case." Id. at 5.
37. 123 Cal. App. 4th 475 (Cal. App. 2d Dist., 2004, pet. granted). In Giles, the trial court
admitted hearsay statements by the murder victim about a prior act of domestic violence. The
appellate court concluded that the defendant forfeited his Confrontation Clause arguments
through his own wrongdoing. It rejected his argument that there was any problem with
permitting the trial court to determine, as a predicate for admissibility of the evidence, that the
defendant had committed the very crime for which he was being tried. Like other courts, the
Giles court pointed to the doctrine's roots in equity: "This 'problem' does not undermine the
equitable reasons for the forfeiture doctrine and does not present the trial court with any undue
procedural difficulty." Id. at 485. The California Supreme Court has granted review of this case
on the following issues: "Did defendant forfeit his Confrontation Clause claim regarding
admission of the victim's prior statements concerning an incident of domestic violence (see Evid.
Code § 1370) under the doctrine of 'forfeiture by wrongdoing' because defendant killed the
victim, thus rendering her unavailable to testify at trial? Does the doctrine apply where the
alleged 'wrongdoing' is the same as the offense for which defendant was on trial?" People v.
Giles, 102 P.3d 930 (Cal. 2004).
38. See, e.g., State v. Alvarez-Lopez, 136 N.M. 309, 314-15 (N.M. 2004) (forfeiture
doctrine did not apply when defendant's act of absconding and remaining a fugitive for seven
years-during which time the witness was deported to Mexico-was not shown to be motivated by
a desire to silence the witness and there was no causal connection between defendant's
misconduct and witness's unavailability); United States v. Jordan, No. 04-CR-229-B, 2005 U.S.
Dist. LEXIS 3289, *2 (D. Colo. March 3, 2005) (refusing to apply forfeiture doctrine in murder
trial when inmate defendant was charged with stabbing a fellow inmate; before his death, victim
said that "Mark Jordan struck me," and that the stabbing was "over drug debts. Jordan owes
about two-thousand dollars for drugs"; district court held that, if government's position were
adopted, the forfeiture doctrine would apply to every murder case; stating that doctrine applies
only to those acts whose purpose is to prevent the testimony); See also People v. Gilmore, No.
258334, 2006 Mich. App. LEXIS 868 (Mich. Ct. App. March 23, 2006) (unpublished opinion)
(holding that to apply the forfeiture doctrine in a situation in which the predicate misconduct
triggering forfeiture and the crime alleged in the indictment are the same would ignore the
presumption of innocence).
39. 841 N.E.2d 420 (Ill. App. 2005).
40. Id. at 351-52 (noting that a causal link "between a defendant's actions and a witness's
unavailability may be established where (1) a defendant puts forward to a witness the idea to
avoid testifying, either by threats, coercion, persuasion, or pressure; (2) a defendant physically
prevents a witness from testifying; or (3) a defendant actively facilitates the carrying out of the
witness's independent intent not to testify.") (quoting Commonwealth v. Edwards, 444 Mass.
526, 541, 830 N.E.2d 158, 171 (2005)). The court held that, absent a causal link between the
defendant's wrongful act and the unavailability of the witness, the Confrontation Clause bars the
use of the declarant's testimonial hearsay. Id. at 355. 
41. See Tex. R. Evid 104(a). That provision states,

 (a) Questions of Admissibility Generally. -Preliminary questions concerning the
qualification of a person to be a witness, the existence of a privilege, or the
admissibility of evidence shall be determined by the court, subject to the
provisions of subdivision (b). In making its determination the court is not bound
by the rules of evidence except those with respect to privileges.
42. Appellant's Brief at 21.
43. Id. at 28.
44. State's Brief at 27.
45. See, e.g., Yates v. Evatt, 500 U.S. 391, 409 (1991) ("An examination of the entire
record reveals that, as to Willie Wood, there was clear evidence of Davis' intent to kill: Instead
of leaving the store when he could have, Davis pursued Wood with a deadly weapon in his hand
and attacked Wood by jumping on his back. This evidence was enhanced by the fact that Davis
had at least two reasons to kill Wood. He could have thought it necessary to avoid being himself
killed or injured by Wood, and he also could have thought it necessary to avoid being identified
by Wood to the police.").
46. Meeks was a fight that escalated to a shooting, and Giles and Moore were both
domestic-violence cases. See notes 35-37 supra.
47. We note that appellate courts may infer from the record evidence that the defendant
intended to prevent a witness or victim from identifying or testifying against him even when the
trial court has not made such a finding explicit when, as here, an intervening change in the law
requires the appellate court to make a decision on the forfeiture doctrine without the benefit of
the trial court having done so. See State v. Romero, 2006 NMCA 45, ___ P.3d ___, ___, 2006
N.M. App. LEXIS 17, 35 (N.M. Ct. App. 2006), cert. granted, 2006 N.M. LEXIS 178 (April 10,
2006).

 We reject appellant's claim that the trial court cannot make a preliminary finding of fact,
under Rule 104(a), that the defendant committed the very act of murder for which he is on trial in
determining the applicability of the doctrine of forfeiture by wrongdoing. Similar preliminary
rulings on an ultimate issue are frequently made in conspiracy cases when a trial judge
determines whether certain statements are admissible as a co-conspirator statement. See
Bourjaily v. United States, 483 U.S. 171, 175 (1987) (trial court makes preliminary
determination, by a preponderance of the evidence, under Fed. R. Evid. 104(a) that a conspiracy
existed and that the defendant was a part of that conspiracy, before co-conspirator statements
may be admitted into evidence); see also Huddleston v. United States, 485 U.S. 681, 687 n.5
(1988). Several pre- and post-Crawford cases have cited Rule 104(a) as the proper mechanism
for the trial court to use in deciding whether the forfeiture doctrine applies in a particular case. 
See United States v. White, 116 F.3d 903, 914 (D.C.Cir. 1997); Mayhew, 380 F. Supp. 2d at 968;
People v. Jones, ___ Mich. App. __, ___, 2006 Mich. App. LEXIS 586 *10-13 (Mich. App.
2006).
48. McDuff v. State, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997); Romero v. State, 800
S.W.2d 539, 543 (Tex. Crim. App. 1990) ("If the trial judge's decision is correct on any theory of
law applicable to the case . . . it will be sustained").